AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
### for the
### Western District of Arkansas
### El Dorado Division

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Feb 13, 2023

OFFICE OF THE CLERK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A LIGHT PURPLE APPLE IPHONE MOBILE DEVICE AND AN ACCOMPANYING SIM CARD TRAY BEARING IMEI NUMBER 356555109720683 CURRENTLY IN FBI CUSTODY AT 100 EAST PEACH STREET, SUITE 205, EL DORADO, ARKANSAS, IN THE WESTERN DISTRICT OF ARKANSAS | No. ____1:23-cm-02____  <br><br> **Filed Under Seal** |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property, *(identify the person or describe property to be searched and give its location)*:
**See "Attachment A"**

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*:
**See "Attachment B." This Court has authority to issue the requested search warrant under Federal Rule of Criminal Procedure 41.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
    [ x ] evidence of a crime;
    [   ] contraband, fruits of crime, or other items illegally possessed;
    [ x ] property designed for use, intended for use, or used in committing a crime;
    [   ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution, and possession with intent to distribute, controlled substances |
| 21 U.S.C. § 843(b) | Unlawful use of a communication facility to commit and facilitate the commission of a felony drug trafficking offense |
| 21 U.S.C. § 846 | Conspiracy to distribute, and to possess with intent to distribute, controlled substances |

The application is based on these facts: (See attached affidavit of SA Warren Rooney, FBI)
[ x ]  Continued on the attached sheet.

[   ]  Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

(Appearing by telephone conference call at 415-527-5035)
SA Warren Rooney, Federal Bureau of Investigation, *Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: **2-13-23**

City and state: **Texarkana, AR**

_____
*Judge's signature*

Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A LIGHT PURPLE APPLE IPHONE MOBILE DEVICE AND AN ACCOMPANYING SIM CARD TRAY BEARING IMEI NUMBER 356555109720683 CURRENTLY IN FBI CUSTODY AT 100 EAST PEACH STREET, SUITE 205, EL DORADO, ARKANSAS, IN THE WESTERN DISTRICT OF ARKANSAS | Case No. _____1:23-cm-02_____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Warren W. Rooney, Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property (Attachment A—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been employed as a Special Agent (SA) of the FBI since July 2022. I was previously employed as a Commissioned Officer in the United States Marine Corps. I am currently assigned to the El Dorado Resident Agency of the Little Rock Division within the FBI. During my employment with the FBI, I have received training concerning and been involved in the investigations of numerous federal offenses to include federal drug trafficking offenses in violation of Title 21 U.S.C. § 841(a)(1) and conspiracy to do the same in violation of Title 21 U.S.C. § 846.

3.      The facts and statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have

1

received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts. Additionally, this affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.      Based on my training and experience, and the facts as set forth in this affidavit, I have probable cause to believe that evidence and instrumentalities of violations of, *inter alia*, Title 21, United States Code, Section 841(a)(1) (distribution, and possession with intent to distribute, controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility in furtherance of a felony drug trafficking offense), and Title 21, United States Code, Section 846 (conspiracy to distribute, and to possess with intent to distribute, controlled substances), which are more fully described in Attachment B hereto, are presently concealed on and within the property described in Attachment A.

## IDENTIFICATION OF PROPERTY TO BE SEARCHED

5.      The property to be searched is a light purple Apple iPhone mobile device and an accompanying SIM card tray bearing International Mobile Equipment Identifier (IMEI) number 356555109720683, which items are further described in Attachment A hereto (hereinafter collectively the "SUBJECT DEVICE"). The SUBJECT DEVICE is currently located at the FBI's El Dorado Resident Agency, at 100 East Peach Street, Suite 205, El Dorado, Arkansas, in the Western District of Arkansas.

6.      The warrant applied for would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

2

## APPLICABLE STATUTES

7.     Title 21 United States Code, Section 841(a)(1) states: Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally – to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

8.     Title 21, United States Code, Section 843(b) states: It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II.  Each separate use of a communication facility shall be a separate offense under this subsection.  For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

9.     Title 21 United States Code, Section 846 states: Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## PROBABLE CAUSE

### Information Provided by CS1

10.     On or about July 29, 2021, FBI Task Force Officer (TFO) Michael Caldwell interviewed a Confidential Human Source (hereinafter "CS1") in reference to distribution of narcotics in Magnolia, Arkansas.  CS1 stated WALTERS relocated from Watts, California to Magnolia, Arkansas in 2016, and is a member of the 'PJ Watts Crip' gang.  CS1 further indicated

3

WALTERS is a large-scale distributer of methamphetamine, ecstasy, pills, and marijuana. CS1 stated that on multiple occasions they observed, among other things, firearms, large quantities of pills, and bricks of methamphetamine, a schedule II substance, at WALTERS' residence located at 1119 Linda Street, Magnolia, Arkansas. Additionally, CS1 stated WALTERS receives shipments of narcotics through the mail from a source of supply (SOS) located in California, who WALTERS referred to as "Main." In addition to storing narcotics at his residence, CS1 stated they believe WALTERS stores narcotics inside an inoperable vehicle located at an unknown location on Highway 98, between the communities of McNeil and Waldo, Arkansas. CS1 also stated WALTERS stores firearms at his brother's residence in Columbia County, Arkansas. CS1 identified WALTERS' telephone number as 870-949-9494 (hereinafter Target Telephone (TT)#3) and stated WALTERS prefers to communicate through Apple's "Facetime" video calling feature.

### August 2021 Controlled Purchase of Methamphetamine

11.     In early August 2021, utilizing CS1, Agents and TFO's conducted the controlled purchase of approximately 115.7 grams (approximately 4 ounces) of methamphetamine from WALTERS at his residence, 1119 Linda Street, Magnolia, Arkansas, which is in the Western District of Arkansas. Prior to conducting the controlled purchase, CS1 completed a consensually monitored telephone call with WALTERS by calling TT#3. CS1 completed the recorded phone call in investigators' presence. CS1 then went to WALTERS' residence to arrange the purchase of four ounces of methamphetamine. Although Agents recorded this meeting with both audio and video recording, the primary recording device fully malfunctioned and the secondary device only recorded a portion of the meeting.

12.     CS1 returned to a predetermined location and advised investigators that WALTERS had removed what WALTERS stated to be one-half pound of methamphetamine, and individually

4

packaged four ounces of methamphetamine to sell them.  CS1 then returned to WALTERS'
residence to purchase the four ounces of methamphetamine.  Agents recorded the controlled
purchase with both audio and video recording, as well as monitored by electronic and physical
surveillance.  Agents reviewed the audio and video recording of the meeting and controlled
purchase, and confirmed the events were consistent with the information provided by CS1.  Agents
conducted a NIC field test of the suspected methamphetamine which provided a presumptive
positive indication for methamphetamine.

### Information Provided by CS2

13.     In January 2022, Agents interviewed a Confidential Human Source (hereinafter
CS2) who sought government consideration for alleged criminal activity.  CS2 stated they met
WALTERS in July 2021, at which time they observed what WALTERS said was 5 pounds of
methamphetamine, 1,500 ecstasy pills, and 250 Roxicodone pills at WALTERS' residence, 1119
Linda Street, Magnolia, Arkansas.  During that meeting, CS2 stated WALTERS provided CS2 one
pound of methamphetamine for CS2 to distribute, with the expectation that CS2 paid WALTERS
for the drugs later from the proceeds of their re-sale.  Between July 2021 and January 2022, CS2
stated they obtained approximately 8-10 pounds of methamphetamine from WALTERS.

### February 2022 Controlled Purchase of Methamphetamine

14.     In early February 2022, CS2 made a consensually monitored telephone call to
WALTERS at 870-904-7344 (hereinafter TT#1), to arrange a future controlled purchase of
methamphetamine from WALTERS.  CS2 recorded and completed the phone call in the presence
of Agents.  During the call, WALTERS answered and immediately told CS2 he would "hit him
right back," which I know, from my training and experience, is slang indicating that WALTERS
would return CS2's call shortly.  Soon thereafter, CS2 received a return call from WALTERS, this

5

time calling from the telephone number 323-841-0813 (hereinafter TT#2).  Area code 323 is assigned to areas of Los Angeles, California.  During that call, which Agents also recorded, CS2 requested two pounds of methamphetamine, to which WALTERS responded "Let me know when you're on your way.  I'll have that shit put together for you."  CS2 indicated they believed WALTERS was probably in California at the time, resupplying on methamphetamine.

15.     On or about February 10, 2022, acting under the control and supervision of the FBI, CS2 conducted a controlled purchase of approximately 453 grams (approximately 1 pound) of methamphetamine from WALTERS, via an unknown male (UM) intermediary (later identified as John GRISSOM), in McNeil, Columbia County, Arkansas.  While meeting with agents prior to that buy, CS2 also showed agents text messages between CS2 and TT#1, in which WALTERS told CS2 to give the cash to "his boy."  In the presence of Agents, CS2 sent a text message to the TT#1 advising WALTERS of their location and asking what to do.  Soon thereafter, CS2 received a telephone call from UM at 870-949-4757 (hereinafter TT#5), who advised CS2 where to meet him.  CS2 also received a text message from TT#1 which shared the UM's contact information, including the above phone number ending in 4757 and a name of "Lil John".  After being equipped with one or more covert audio/video recording devices, with which to record the transaction, CS2 then departed the meeting with agents and met the UM, who led them by vehicle to a residence in McNeil, Arkansas.

16.     Shortly thereafter, CS2 returned to meet with Agents, at which time CS2 turned over approximately 453 grams (approximately 1 pound) of suspected methamphetamine to Agents, which CS2 indicated had been provided to them by the above-described UM, later identified as GRISSOM.  A sample of that substance later field-tested positive for the presence of methamphetamine, which is a controlled substances under federal law.  A review of the audio and

6

video recording of the above-described controlled purchase was consistent with the information provided by CS2. Although GRISSOM's face cannot be seen in the recording (he wore a mask during the transaction with CS2), his clothing and other identifying characteristics can be seen. The Drug Enforcement Agency (DEA) Southeast Laboratory in Miami, Florida, later analyzed the suspected methamphetamine purchased by CS2 during the above-described controlled buy, finding it to contain approximately 434.2 grams of actual (pure) methamphetamine.

### June 2022 Distribution of Methamphetamine

17.     On or about June 15, 2022, WALTERS (while in California and utilizing TT#2), and others, including Marcus JORDAN and GRISSOM (a/k/a "Lil John") arranged and conducted an illicit drug transaction. According to the above-referenced reliable source of information, the transaction began when, during a June 15 conversation between GRISSOM and WALTERS, GRISSOM said, "two left or whatever. Prolly gonna need bout like, um..... at least bout five more." From my training and experience in this investigation, I interpret GRISSOM's statements as meaning that GRISSOM had two pounds of methamphetamine on hand and was requesting a resupply of five additional pounds from WALTERS. In response to that request by GRISSOM, the same source of information indicated WALTERS told GRISSOM, "I'm gonna have him come drop em off over there", which I interpret to mean that WALTERS would begin to arrange the requested resupply.

18.     Not long after the above-described conversation between WALTERS and GRISSOM, the same reliable confidential source of information indicated WALTERS contacted JORDAN. During the conversation with JORDAN, the same source of information indicated WALTERS told JORDAN he was, "trying to get you to take five of them thangs to the house for me." WALTERS went on to tell JORDAN that, "once you get them there I'm going to tell him to

come get them." From my training and experience, including in this specific investigation, I interpret this as WALTERS telling JORDAN to take five pounds of methamphetamine to another location, for the purposes of resupplying GRISSOM. WALTERS continued coordinating the drug transaction by directing the delivery of methamphetamine and money for the methamphetamine between GRISSOM, JORDAN, and others.

### Termination of use Pertaining to TT#2 and Identification of TT#12

19.     On or about July 16, 2022, while conducting analysis of call detail records (CDR) associated with several associates of WALTERS, Agents observed that telephone number 870-397-5662 (hereinafter TT#12) contacted at least three close associates of WALTERS including Dawnisha JORDAN (hereinafter D. JORDAN), Malaysia BENJAMIN, and JORDAN. Additionally, according to the above referenced confidential reliable source of information, WALTERS intended to discontinue use of TT#2, or obtain a new telephone number, and indicated the new phone number would contain an 870-area code. Furthermore, according to the same confidential reliable source of information, on July 6, 2022, an unknown female utilized TT#2 to set up service for the TT#12.

20.     Pursuant to an administrative subpoena issued by the FBI, Verizon Wireless (hereinafter Verizon) provided subscriber and tolls records for TT#12. Verizon indicated that TT#12 was activated on July 6, 2022, and service was assigned to Tracfone. Therefore, Verizon was unable to provide specific subscriber information for TT#12. From your Affiant's training and experience, I know it is common for individuals distributing narcotics to utilize telephone numbers with no subscriber information to avoid detection by law enforcement. Additionally, Agents conducted common call analysis between TT#2 and TT#12, for the dates June 26, 2022, through July 16, 2022 (the period encompassing about ten days prior to and after the activation of

TT#12) and noted that, even though TT#12 had only been activated for ten days, it shared at least nine commonly called telephone numbers with TT#2.

21.     Considering the termination of use pertaining to TT#2 on July 17, 2022, and the activation of TT#12 on July 6, 2022, Agents believed that TT#12 simply replaced TT#2 as a device maintained and used for WALTERS' criminal endeavors. The tactic of regularly changing telephone numbers to avoid detection by law enforcement is typical of drug traffickers, and the fact WALTERS did so (based on the facts set forth in this affidavit), is demonstrative of the idea that TT#12 is used in furtherance of illegal activity, as was its predecessor phone. On August 2, 2022, the Hon. Barry A. Bryant, United States Magistrate Judge for the Western District of Arkansas, issued a federal search warrant authorizing the prospective collection of geolocation data associated with TT#12. Pursuant to that order, on August 4, 2022, Verizon began providing the FBI location data relative to TT#12.[1]  Soon thereafter, monitoring of TT#12 location data, as well as the authorized use of a vehicle tracking device installed on WALTERS vehicle[2], indicated that WALTERS travelled from Magnolia, Arkansas to California.

### Recovery of the Subject Device from Walters in California

22.     On August 10, 2022, FBI located and arrested Walters in Hawthorne, California, pursuant to a federal arrest warrant previously issued in this Court. Location data associated with TT#12 was used to locate WALTERS and effect that arrest. During a search incident, following that arrest, agents located the SUBJECT DEVICE in WALTERS' possession. The SUBJECT

---

[1] *See* Docket No. 1:22-cm-00037.

[2] On July 19, 2022, the Hon. Barry A. Bryant, United States Magistrate Judge for the Western District of Arkansas, entered an order authorizing the use of a vehicle tracking device on WALTERS' Dodge Durang for a period of 45 days. *See* Docket No. 1:22-cm-00026.

DEVICE was the only mobile device in WALTERS' possession at the time of his arrest, leading investigators to conclude that it was presently associated with the TT#12 telephone number.

23. The SUBJECT DEVICE is currently held in evidence at 100 E Peach Street, Suite 205, El Dorado, Arkansas. In my training and experience, I know that, since the time of its recovery from WALTERS on August 10, 2022, the SUBJECT DEVICE has been stored and transported in such a manner that its contents remain in substantially the same state as when it was recovered from WALTERS on August 10, 2022.

**Search of Walters' Two Magnolia Residences**

24. On August 10, 2022—the same date the SUBJECT DEVICE was recovered from WALTERS in California—FBI investigators searched WALTERS' two Magnolia, Arkansas, residences, which are located at 923 West Monroe[3] and 1119 Linda[4] streets. These searches were conducted pursuant to federal search warrants issued and signed by the Hon. Barry A. Bryant on August 4, 2022.

25. Inside 1119 Linda Street (which was WALTERS' primary residence at the time), investigators found and seized, among other things, approximately 1,094 grams (slightly under 1.1 kilograms) of a substance later determined by a DEA laboratory to contain cocaine, a Schedule II controlled substance, 144 suspected 'ecstasy' tablets (which were later determined by a DEA laboratory to contain a total of 1.12 grams (+/- 0.28 grams) of actual (pure) methamphetamine), approximately 594.5 grams (about 1.3 pounds) of a green vegetable substance that investigators recognized, from their training and experience, as marijuana, a Schedule I controlled substance,

---

[3] *See* Docket No. 1:22-cm-00040.

[4] *See* Docket No. 1:22-cm-00041.

two firearms (to include a Springfield Armory XD .357 SIG pistol, and a Browning .25 ACP pistol), and multiple firearm magazines and rounds of ammunition.

26.    Inside 923 W. West Monroe Street (which WALTERS paid for, controlled, and kept property in, and where co-defendant Malaysia BENJAMIN and her children were then staying), investigators found and seized, among other things, 2,075 suspected fentanyl tablets weighing approximately 224.8 grams (at least 70% of which, to a minimum 95% level of confidence, were later determined by a DEA laboratory to contain para-fluorofentanyl, a fentanyl analogue and Schedule I controlled substance), approximately 632.5 grams (roughly 1.4 pounds) of a green vegetable substance that investigators recognized, from their training and experience, as marijuana, a Schedule I controlled substance, approximately 35 grams (about 1.2 ounces) of a substance that later 'field-tested' positive for the presence of cocaine, one firearm (a Taurus PT 111 Pro 9mm pistol), a firearm magazine and ammunition, and $10,230.99 in cash.

## TECHNICAL TERMS

27.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  *Wireless telephone*:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone

11

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations.

PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.    Based on my training, experience, and research I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the SUBJECT DEVICE.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

14

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

15

with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.    For the reasons set forth above, I respectfully submit there is probable cause to believe that the evidence described in Attachment B will be located on or within the SUBJECT DEVICE described in Attachment A. Throughout this investigation, WALTERS consistently utilized electronic and telephonic means of communication to coordinate illicit drug transactions. At the time of his arrest, the only known number used by WALTERS was TT#12. Location data provided to Agents by Verizon pursuant to a federal search warrant placed TT#12 at the same location as WALTERS on the day of his arrest. Agents found only one electronic device in WALTERS' possession when he was arrested on that date. Additionally, FBI employees and TFO's found, amongst other items, firearms, money, and drugs at two residences associated with WALTERS on the day of his arrest. Based on my training and experience, I know individuals involved in drug distribution use firearms to protect drugs in their possession and deal primarily in cash transactions. Therefore, based on the totality of the circumstances, I can reasonably believe the SUBJECT DEVICE is the electronic device associated with TT#12, and that WALTERS was still actively involved in the distribution of controlled substances on the day of his arrest.

34.    Therefore, I respectfully request this Court issue a warrant authorizing the search of the SUBJECT DEVICE described in Attachment A, and the seizure of the evidence and instrumentalities described in Attachment B, which, individually or collectively, constitute violation(s) of Title 21, United States Code, Section 841(a)(1) (distribution, and possession with intent to distribute, controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility in furtherance of a felony drug trafficking offense), and/or Title 21, United States Code, Section 846 (conspiracy to distribute, and to possess with intent to distribute, controlled substances).

Respectfully submitted,

(Appearing by telephone conference call at 415-527-5035)
Special Agent Warren Rooney
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 13th day of February, 2023.

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched (hereinafter collectively the "SUBJECT DEVICE") is a light purple Apple iPhone mobile device and an accompanying SIM card tray bearing IMEI number 356555109720683 currently in the possession and custody of the Federal Bureau of Investigation, El Dorado, Arkansas, Resident Agency, located at 100 East Peach Street, Suite 205, El Dorado, Arkansas, in the Western District of Arkansas, under evidence number 1B218.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of locating the electronically stored information described in Attachment B.

18

## ATTACHMENT B

## THINGS TO BE SEARCHED FOR AND SEIZED

1.      All records, data, information or material of any kind, whether physical or digital/electronic, contained on or within the SUBJECT DEVICE described in Attachment A which constitute evidence and/or instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (distribution, and possession with intent to distribute, controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility in furtherance of a felony drug trafficking offense), and/or Title 21, United States Code, Section 846 (conspiracy to distribute, and to possess with intent to distribute, controlled substances), including, but not limited to:

   a.  lists of contacts, customers and related identifying information;
   b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
   c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
   d.  any information recording WALTERS' schedule or travel from August 1, 2021 to the present;
   e.  all bank records, checks, credit card bills, account information, and other financial records;

2.      Evidence of user attribution showing, or in any way tending to show, who used or owned the SUBJECT DEVICE, including, but not limited to logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records", "data", "information" and "material" include all of the foregoing items of evidence in whatever form, and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic, audio, or video form.

19

4.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.